IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -v-

20-CV-

$114,063.53 UNITED STATES CURRENCY SEIZED
FROM BANK OF AMERICA ACCOUNT #8936,

     Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE

The United States of America, by its attorneys, James P. Kennedy, Jr., United States

Attorney for the Western District of New York, Grace M. Carducci, Assistant United States

Attorney, of counsel, for its verified complaint herein alleges as follows:

## INTRODUCTION

1.      This is an action *in rem* for the forfeiture of $114,063.53 in United States

currency (hereinafter referred to as the "defendant currency"), seized from a Bank of America

account #XXXXXXXX8936 (hereinafter referred to as "BOA Account #8936") held in the

name of Med-Cor Staffing Inc., and is subject to forfeiture under the provisions of Title 18,

United States Code, Sections 981(a)(1)(C) and 984, as any property, real or personal, which

constitutes or is derived from proceeds traceable to any offense constituting "specified

unlawful activity" (as defined in section 1956(c)(7) of this title and hereinafter referred to as

"SUA"), namely wire fraud in violation Title 18, United States Code, Section 1343 and

fraudulent loan and credit applications in violation of Title 18, United States Code, Section

1014.

2.     The jurisdiction of this Court is invoked pursuant to Title 28, United States Code, Sections 1345, 1355, and 1395.   Venue is properly premised in the Western District of New York pursuant to Title 28, United States Code, Section 1395.

3.     The defendant currency is being held in the United States Customs and Border Protection ("CBP") seizure account and remains in the custody of the Port Director, CBP, Buffalo, New York.

## BACKGROUND

4.     In January 2020, the Secretary of Health and Human Services declared a public health emergency under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), in response to COVID-19. On March 13, 2020, the President of the United States declared a national emergency to address the growing COVID-19 threat to national security and well-being. On March 22, 2020, the U.S. Attorney for the Western District of New York, James P. Kennedy, issued a public statement prioritizing the investigation and prosecution of COVID-19 fraud schemes. On April 2, 2020, U.S. Attorney Kennedy, in conjunction with the Internal Revenue Services, Criminal Investigation Special Agent in Charge Jonathon D. Larsen, issued another public statement warning the public of COVID-19 fraud schemes.

5.     On February 4, 2020, the Secretary of Health and Human Services (HHS) determined that there was a public health emergency and that circumstances existed to justify the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19.   Rapid detection of COVID-19 cases in the United States required wide availability of diagnostic testing to control the emergence of this rapidly spreading, severe illness

2

6.     On February 29, 2020, the FDA issued a policy guidance, entitled "Policy for Diagnostic Tests for Coronavirus Disease - 2019 during the Public Health Emergency, Immediately in Effect Guidance for Clinical Laboratories, Commercial Manufacturers, and Food and Drug Administration Staff, March 2020," describing a policy for laboratories and commercial manufacturers to help accelerate the use of tests they develop in order to achieve more rapid and widespread testing capacity in the United States. The guidance described two policies for accelerating the development of certain laboratory tests for COVID-19 – one requiring an Emergency Use Authorization (EUA) submission to FDA, and the other, not when the test is developed under the authorities of the State in which the lab resides and the State takes responsibility for COVID-19 testing by laboratories in its State, not requiring an EUA submission.    In addition, this guidance described a policy for commercial manufacturers to more rapidly distribute their COVID-19 diagnostics to laboratories for specimen testing after validation while an EUA is being prepared for submission to FDA. Finally, this guidance also described a policy regarding the use of serological testing without an EUA.   This guidance was updated on March 16, 2020.   Notably, the emergency use guidance expressly excluded any home testing kits offered for direct sale to and use by consumers from the enforcement discretion articulated by the Food and Drug Administration.

7.     On or about March 25, 2020, the Department of Health and Human Services announced the issuance of a Notice under Executive Order 13910 ("Executive Order") and section 102 of the Defense Production Act of 1950 (the "Act"), 50 U.S.C. § 4512, as amended designating health and medical resources necessary to respond to the spread of COVID-19 that are scarce or the supply of which would be threatened by excessive accumulation (the

"Designated Materials"). These Designated Materials include, but are not limited to, N-95 Filtering Facepiece Respirators, Personal Protection Equipment ("PPE") face masks, PPE surgical masks, sterilization services, and disinfecting devices.

8. The Small Business Administration (hereinafter SBA) is a federal agency of the Executive Branch that administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses. Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan. Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels. When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

9. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other business expenses through the Paycheck Protection Program ("PPP"). On April 24, 2020, the Paycheck

Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding.

10.     The PPP allows qualifying small businesses and other organizations to receive unsecured SBA-guaranteed loans with a maturity of two years and interest rate of one percent. PPP loan proceeds must be used by businesses on payroll costs, mortgage interest, rent, and/or utilities. The PPP allows the interest and principal to be forgiven if businesses spend the proceeds on these expenses under certain conditions. Pursuant to the CARES Act, the amount of PPP funds a business is eligible to receive is determined by the number of employees employed by the business and their average payroll costs. Businesses applying for a PPP loan must provide documentation to confirm that they have in the past paid employees the compensation represented in the loan application. The PPP is overseen by the SBA, which has authority over all PPP loans, but individual PPP loans are issued by approved commercial lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

11.     The CARES Act also expanded the separate Economic Injury Disaster Loans (hereinafter EIDL) Program, which provided small businesses with low-interest loans of up to $2 million prior to in or about May 2020 and up to $150,000 beginning in or about May 2020, which can provide vital economic support to help overcome the temporary loss of revenue they are experiencing due to COVID-19. To qualify for an EIDL under the CARES Act, the applicant must have suffered "substantial economic injury" from COVID-19, based on a company's actual economic injury determined by the SBA. EIDLs may be used for payroll and other costs as well as to cover increased costs due to supply chain interruption, to pay obligations that cannot be met due to revenue loss, and for other similar uses. The CARES

Act also permitted applicants to request an advance of up to $10,000 to pay allowable working capital needs, which was expected to be paid by the SBA within three days of submission of an EIDL application to the SBA, provided the application contains a self-certification under penalty of perjury of the applicant's eligibility for an EIDL. Unlike the PPP, the SBA directly makes loans to applicants under the EIDL Program.

## INVESTIGATION

12.     Homeland Security Investigations ("HSI") conducted an investigation into Med-Cor Staffing Inc. ("Med-Cor") and Joseph Bella ("BELLA"), CEO of Med-Cor, regarding suspected violations of federal wire fraud laws as set forth in Title 18, United States Code, Sections 981(a)(1)(C), 1343 and 1956(c)(7)(A), in relation to COVID-19 fraud schemes.

13.     On or about March 30, 2020, HSI became aware of Facebook posts by BELLA dated March 29, 2020, and April 8, 2020. On the Facebook posts, BELLA advertised the sale of FDA approved COVID-19 test kits. The Facebook posting is excerpted verbatim below as follows:



14.	The investigation revealed that the email address provided in the Facebook post, JBella@Med-Cor.com, in fact belongs to BELLA, and that BELLA purports to own a staffing company called Med-Cor, operating in Buffalo, New York. Med-Cor's public facing webpage is found at URL www.med-cor.com.

15.	On or about March 30, 2020, HSI conducted database research and learned that the domain registrar for www.med-cor.com was www.tierra.net.	On April 7, 2020, TierraNet Inc. dba DomainDiscover ("TierraNet"), responded to a federal Grand Jury subpoena issued and indicated that it is only acting as the domain registrar, and that they do not provide hosting for the website or email server.	However, response records indicated BELLA does pay TierraNet to maintain the domain registration for www.med-cor.com and other domain names.	TierraNet bills Joe Bella for those services as indicated below:

> INDUSTRIAL LINK, LLC
> ATTN: JOE BELLA
> 224 SUMMER STREET
> BUFFALO, NY 14222
> UNITED STATES

16.	The investigation further revealed that the TierraNet billing invoices indicate that BELLA has numerous internet domains, as follows: med-cor.com, buffalostaffing.com, wnynursing.com, debtheads.com, bufftemps.com, 716staffing.com, ndtagency.com, buffalostaffing.net, perfectnurses.com, and biofend.com.

17.	HSI conducted an internet search of http://med-cor.com indicates that "Med-Cor was established in 2012 to fulfil the overwhelming need for Healthcare personnel in Western New York. Our focus is on providing catered Healthcare Staffing Solutions to our clients. We pride ourselves on sourcing ONLY superior talent to meet your specific needs, no

matter how challenging your staffing requirements are." The "Contact Us" portion of Med-Cor's website, reveals that Med-Cor Staffing, Inc. is located at 155 Summer Street, Buffalo, New York 14222. The information appears on the website as follows:



18. Med-Cor does not advertise the sale of any medicine, medical devices or equipment, and neither BELLA, nor Med-Cor, possess any Food Drug Administration (FDA) licenses, and neither Med-Cor nor BELLA are listed on the FDA's In Vitro Diagnostics End Use Authorization for detection and/or diagnosis of the novel coronavirus (2019-nCoV).

19. On or about April 2, 2020, BELLA engaged in a series of emails with an HSI undercover ("UC") who was posing as though the UC worked for a company and wanted to purchase COVID-19 test kits, as advertised by BELLA on Facebook. In response to the UC's email request, to BELLA at JBella@Med-Cor.com, BELLA provided a .pdf document purporting to be from Med-Cor's "COVID-19 Product line," purporting to provide details of the COVID-19 test kits being sold by BELLA/Med-Cor. It should be noted that Facebook's

servers are located outside of the state of New York, and the UC's emails with BELLA also traveled via interstate wires.

a) Specifically, the UC emailed BELLA verbatim the following April 2, 2020:

> *Joseph,*
>
> *Can you please provide me additional details on the kits? Manufacturer, brand, etc., or a picture if you have one. We would be interested in a large purchase. Just getting details on final numbers now for kits.*
>
> *Also, are you expected to be getting any additional masks in?*
>
> *Thank you,*

b) BELLA responded on April 2, 2020 and added "Individual 1" to the email cc: line. BELLA's verbatim response follows:

> *Test kit details incoming…*
>
> *And masks are order to cash. They have a 10-14 day turnaround.*
>
> *Joseph C. Bella III, CEO*

c) Later that same evening on April 2, 2020, the UC received an incoming email from "Individual 1" with BELLA named on the cc: line, as follows:

> *Good Afternoon {Redacted},*
>
> *That requested information related to the COVID-19 test kits is attached.*

*We are looking forward to working with you. If you have any questions or require any additional information do not hesitate to contact me at your convenience.*

*Very truly yours,*

*["Individual 1" email signature block]*

20.     HSI's analysis of the metadata of the .pdf document emailed to the UC, purporting to be from Med-Cor's "COVID-19 Product line," reveals that the document was created on April 2, 2020, which was the same day the UC requested details via email from BELLA about the test kits.   Moreover, the .pdf document references components of tests manufactured by two different companies.   As referenced on the bottom of page #1 of the .pdf, the Logix Smart COVID-19 test is manufactured by Co-Diagnostics in Utah, however, the reagents listed on page #1 are from a test kit manufactured by Shanghai ZJ Bio-Tech Co., Ltd. China.

21.     On or about April 3, 2020, the UC received an email from BELLA as follows:

*$35/kit for large orders (10k+).*

*Goes down to $30 for 50k.*

*Half down and they are shipped from S. Cali. in dry ice.*

*These are swan[sic] tests. The swab needs to be in the nose for a few secs. Then 45 mins for results.*

*Will need LOI[1]  and we will send baking info.*

22.     On or about April 3, 2020, the UC engaged in a recorded telephone conversation with BELLA.   During the call, BELLA identified himself, stated that the price

---

[1] "Letter of Intent."

for each purported COVID-19 test is $35.00 U.S. currency, and that the minimum order is 5000 tests (for a total of $175,000). BELLA further indicated that a 50% deposit of $87,500 would be required for the purchase order. Additionally, during the call BELLA indicated, "we only have a million tests […]. I have only got 50,000 with my name on them. There are eleven (11) partners in this company…of that company. I've only got 50,000 [test kits]." BELLA continued and stated, "I just sold 25,000 to the United States government, to "Individual 2", and now I've got 25,000 left." HSI agents contacted "Individual 2" on April 7, 2020 and determined that they have not purchased any COVID-19 test kits from any source.

23. On or about April 8, 2020, HSI agents spoke by telephone to the head of International Sales for Co-Diagnostics, the manufacturer of Logix Smart COVID-19 test, and learned the following:

a) The Logix Smart COVID-19 test is designed for laboratory use only and requires specialized personnel and equipment.

b) The tests are sold in kits made up of three components. The components are Logix Smart COVID-19 Master Mix, Logix Smart COVID-19 Positive Control, and Nuclease Free Water.

c) Co-Diagnostics does not use the term Super Mix. In the product description .pdf that BELLA caused to be emailed to the UC, it described the types of reagents used by the Logix Smart COVID-19 test kits as Novel CoV (2019-nCoV_ Super Mix, RT-PCR Enzyme Mix, and Novel CoV (2019-nCov) Internal Control. These are not the names of the regents for the Co-Diagnostics Logix Smart COVID-19 kits that BELLA/Med-Cor is purporting to sell.

d) Co-Diagnostics sells kits directly to end users, (i.e. labs), and through a chain of licensed distributors who are required to register with FDA.

e) Co-Diagnostics charges end users $10.00 per test. Distributors pay $10.00 per test or less, and are allowed to resell at a reasonable mark-up. The tests can be sold for as much as about $18.00 per test but that markup is typical of tests sold outside the United States.

24. The investigation revealed that the COVID-19 test kits were shipped to 155 Summer Street, Buffalo, New York by Co-Diagnostics on or about April 17, 2020, with Med-Cor and BELLA identified as a laboratory capable of running COVID-19 test kits. Pursuant to the UC's discussions with Co-Diagnostics, if they were aware that the tests were intended for resale by BELLA and Med-Cor and that they were not an end user capable of running the tests, Co-Diagnostics would not have fulfilled the order. The Co-Diagnostics COVID-19 test can only be performed in a CLIA[2] certified laboratory. The investigation further revealed that these same tests could have been purchased directly from Co-Diagnostics by end users for $10 per test. Co-Diagnostics sells test kits to distributors for less than $10 per kit.

25. On or about April 8, 2020, BELLA posted a "MedCor PPE update" via Facebook. In the post, BELLA indicates MedCor's current stock of COVID-19 tests is 45,000 and that the tests provide results within two hours. In his March 29, 2020, post BELLA indicated his test returned results within 48 hours. As noted above, during the April 3, 2020, telephone conversation with the HSI UC BELLA indicated he started with 50,000

---

[2] The Clinical Laboratory Improvement Amendments of 1988 (CLIA) regulations include federal standards applicable to all U.S. facilities or sites that test human specimens for health assessment or to diagnose, prevent, or treat disease. See https://www.cdc.gov/clia/index.html. It should be further noted that BELLA's statements to the UC implied that the test kits were point of care tests that could be administered and obtain results at a doctor's office with the purchase of some "lab equipment" or even by "a phlebotomist." BELLA's statements to the UC are inaccurate and misleading insofar as the Co-Diagnostics COVID-19 test can only be performed in a CLIA certified laboratory.

tests but had already sold 25,000 to "Individual 2", and that no new tests would be manufactured for some time.   If BELLA's statements to the UC on April 3, 2020, were true, he should only have 25,000 tests as of April 8, 2020.   The Facebook posting, indicating he has 45,000 COVID-19 tests, is excerpted verbatim below as follows:



26.     The UC continued to negotiate with BELLA regarding the purchase of what BELLA purports to be FDA approved COVID-19 test kits, which included a recorded telephone call between the UC and BELLA on or about April 8, 2020.   During the April 8, 2020, telephone call BELLA indicated that the test kits would be shipped from a warehouse in San Diego, California.

27.     During his April 8, 2020, phone conversation with the UC, BELLA stated that: "[W]e have doctors that went out and spent 10 to 15 thousand dollars […] that are doing drive-through clinics; we have hospitals[…] that's that part we don't get involved in—how they do it."     BELLA then described how an individual would take the test, as follows:

"[Y]ou take basically a Q-tip, and a swab and you put it in the nose for about 5 to 7 seconds with the nose held horizontally. So you lean your head back, put it in the nose for 5 to 7 seconds, you throw this in the container, and then we'll have to get the—almost like a litmus test result that can be read within 45 minutes. […] Then we will know if the person if positive or negative for COVID-19." It should be noted that BELLA told the UC that test results would be available in 45 minutes, whereas the Med-Cor "COVID-19 Product Line" .pdf claimed samples could be prepared and processed in 90 minutes.

28. BELLA continued, "[N]ow what's more important is we're about the only company that has these available, but what's even more important is we are definitely the only company that has the exit tests. See once somebody is tested, they get quarantined. […] We have an exit test to make sure that 10 to 14 days later it's out of them-- so we can remove the quarantine from the people. So there is a secondary test available that we can offer as well." BELLA continued, "[W]e have it all. This is an encompassing arena. We have every single thing that can be imagined as far as testing for COVID from—from conception to shrink wrap." When asked if everything was manufactured in the United States, BELLA stated, "It is." Later in the conversation, BELLA stated to the UC, "We have a warehouse set up right now in San Diego where these are being frozen, they have to remain frozen at negative 20 degrees. When we ship them— it's half the money is required down, half at the time of receipt. […] The directions will all be sent. There is everything you could imagine as far as directions. This is not something we are going to feed anybody to the wolves with. The scientists and the doctors are in the lab fielding calls all day. […] Its doctors and scientists in the lab answering phones. There's not a call center."

29.     BELLA continued to explain that the 50% deposit would be $87,500, and that it would take Med-Cor four days for them to procure, break the order down, get it packaged in dry ice, put on an airplane, and "get it to your door- four days."   BELLA further stated that if the order was funded today [April 8, 2020] then the test kits would be there on Saturday [April 11, 2020].   BELLA also clarified that shipping costs were not included in the total $175,000 U.S. currency total order purchase price, and estimated the shipping costs would be an additional $1240 U.S. currency, and told the UC to prepare to spend up to $2,000 U.S. currency in shipping costs. BELLA further stated, "If this thing [the COVID-19 test kit purchase] is completely price sensitive, then it's gonna be touchy because […] for $175,000 to save one life is a good deal; […] we're potentially saving 5,000 [lives]."

30.     Next, during the April 8, 2020, phone call with the UC, BELLA asked the UC to hold on the line, then appeared to have a conversation with someone else in the room on his end of the phone, and stated: "Put them on with Dr. "K" [pause]… Yeah it's not a standard—it's not the same Q-tip you're gonna get at Walgreens.   "K" has them he can even ship them—put em on with "K" he's got that, thanks." Then, returning to the conversation with the UC, BELLA stated, "What we are dealing with right now is a very, very precarious animal.   We're gonna flatten this curve inside of the next month by testing everybody, and by getting them retested, and by quarantining those that have it, and it's the only way we can do business.   We also have masks and gowns if anybody is interested, from 3 ply, to KN95[3], to open or closed back gowns.   Whatever you guys could use, we are in business to help."

---

[3] Contrary to BELLA's claims earlier in the April 8, 2020, phone call that "everything" was manufactured in the United States, KN95 masks are a product manufactured in the Country of China.

31.     BELLA concluded the call and, regarding the COVID-19 test kits, stated, "Let them know that we are an exclusive licensed reseller of this product.   We are a distributor. There is no possible way to do this better, faster, or cheaper, then what we have to offer, we are here to help."   As set forth above, Med-Cor is not a licensed distributor of Co-Diagnostics' Logix Smart COVID-19 test kit, and BELLA's statements claiming to be a distributor are also inconsistent with his claim that they have "[t]he scientists and the doctors [ ] in the lab fielding calls all day," such as Dr. "K"."

32.     On or about April 14, 2020, the UC emailed BELLA as follows:

> *Joe,     Please see attached LOI[4].*
>
> *Let me know if you have any questions.*
>
> *Please sign and return at you[sic] convenience.*

a)     On April 15, 2020, "Individual 1" responded to the UC by email[5] as follows:

> *Good Morning [Redacted],*
>
> *Medcor Invoice # 20-1457 attached for the medical supplies you ordered. Please confirm your shipping address asap.*
>
> *Payment for 25% of the invoice amount is due now.*
> *Payment for 25% of the invoice amount is due upon receipt of shipping/tracking information.*
>
> *The balance is payable in full upon delivery.*
> *Please send your payment to ….*
> *Medcor Staffing, Inc.*
> *155 Summer Street*

---

[4] The attachment to the email was a Letter of Intent between the UC company, represented by the UC, and BELLA and Med-Cor for the purchase of 5,000 Med-Cor P-1001 COVID-19 Test Kits for $35.00 apiece.

[5] HSI agents reviewed the email message string and noted BELLA forwarded the UC's April 14, 2020, email to "Individual 1" on April 15, 2020, at about 10:11 a.m.   "Individual 1" then communicated with the UC by forwarding the email again to the UC.

*Buffalo, NY 14222*
*716-853-2100*

*By EFT or Wire Transfers*
*Medcor Staffing. Inc.*
*Account number 4830 6856 8936*
*Routing number 026009593*
*Bank of America 495 Elmwood Ave. Buffalo, NY 14222*
*Checking*

*Thank you in advance.    If you have any questions or require any additional information do not hesitate to contact me at your convenience.*

*Very truly yours,*

*["Individual 1" email signature block]*

33.     HSI agents reviewed the Med-Cor Invoice # 20-1457, which was attached to "Individual 1" above described email. The invoice was dated April 15, 2020. The invoice was for the purchase of 5,000 COVID - 19 Test Kits P-10001 at $35.00 each.   The invoice listed the same payment terms as the email.   It should be noted that, according to Co-Diagnostics, the manufacturer of the Logix Smart COVID-19 test, test kits typically sell for approximately $10 dollars, and the reagents used with the Logix Smart COVID-19 test do not match the description provided by Med-Cor. The UC then responded to "Individual 1"'s email and provided the shipping address as "Individual 1" requested. BELLA was copied on the email. On or about April 15, 2020, "Individual 1" emailed the UC with subject line RE: COVID 19 Supplies LOI. Attached to the email was a scanned copy of the Letter of Intent the UC emailed to BELLA and signed by "Individual 1" on behalf of Med-Cor.

34.     On or about April 16, 2020, HSI, via interstate wire, transferred $43,750.00 to the BOA Account #8936 from an undercover HSI account. BELLA texted confirmation he received the funds from the UC on April 16, 2020. BELLA also stated he would send the UC

shipping information and that the UC, "Should have it by the end of the day Salt Lake City time." Then BELLA emailed to the UC a tracking number for a package that left Salt Lake City, Utah, on April 17, 2020. BELLA and the UC communicated by text message on April 17, 2020. BELLA stated that the shipment was processing and would likely ship that day.

35.     On or about April 20, 2020, the UC and BELLA communicated by text message as detailed below:

> BELLA:                     *Good morning.   You've been sent the tracking info.*
>
> BELLA:                     *To your email.*
>
> UC:                        *Ok great*
>
> BELLA:                     *Your package is in.*
>
> UC:                        *Oh. I wasn't expecting it until tomorrow. At the earliest.   I better get on that. When was it packaged? How much time do I have left with dry ice?*
>
> BELLA:                     *It is safe right now in our lab. You have time.   But have your freezer ready tomorrow.   I believe it's got to be at -120 degrees but check the directions to be sure.*
>
> BELLA:                     *-20*
>
> BELLA                      *Please call to arrange the rest of the payment and delivery.*

36.     The tracking number BELLA emailed to the UC was 770266136443; a FedEx tracking number.   According to tracking information available at www.fedex.com, that is the tracking number for a package that left Salt Lake City, Utah, on April 17, 2020.   The package

was delivered to Buffalo, New York, on April 20, 2020. "Individual 3" signed for the package.

37. On or about April 20, 2020, the UC attempted to retrieve the package at the UC shipping address the UC provided to "Individual 1" during the ordering process. No packages had been delivered for the UC.

38. On or about April 20, 2020, the UC engaged in a recorded telephone conversation with BELLA. During the call, BELLA stated, "we packed it[6] more dry ice. We have it in our lab freezer." BELLA then requested the remainder of the payment and asked the UC how the UC wanted to handle delivery. BELLA asked if payment and delivery could be made before 12:00 p.m. or 1:00 p.m. on April 21, 2020. BELLA stated he was leaving town to drive to New York [City] with his cousin, who is one of the international union heads. The purpose of their trip is to pick up two box trucks loaded with masks that they are going to drive back to Buffalo, New York. BELLA confirmed the tests were in Buffalo, New York. The UC asked BELLA where his lab is located. BELLA responded that "Med-Cor has a few of them in Buffalo. It's right now on Summer Street." BELLA then provided 155 Summer Street as the address for Med-Cor.

39. On or about April 20, 2020, the UC engaged in a second recorded telephone conversation with BELLA. During the call, BELLA stated he likely would not be present when the UC's driver came to Med-Cor to pick up the tests. BELLA stated there are three people in the lab office and one of those people would facilitate the transfer of the tests to the UC's driver. BELLA said he would be away delivering masks. He said his mask customers

---

[6] Referring to the shipment of COVID-19 tests.

included Rich Products, ECMC and the Cleveland Clinic. The UC asked if "Individual 1" would be available. BELLA said Individual 1 would be available. BELLA went on to say he has known "Individual 1" since BELLA was at Dartmouth and "Individual 1" was at a competitor school. BELLA and the UC made arrangements for the tests to be picked up from Med-Cor on Wednesday, April 22, 2020.

40.     On or about April 21, 2020, HSI Special Agents conducted surveillance of 224 Summer Street and noted that BELLA's Cadillac Escalade was visible in the driveway. On April 20, 2020, BELLA told the UC that he was traveling to New York   Based on the HSI Special Agent's observations, training, experience, and participation in this investigation, they believed BELLA's statement to the UC to pick up medical supplies was false and was most likely an attempt to pressure the UC into making additional payments to BELLA.

41.     On or about April 20, 2020, an HSI agent spoke with the Head of International Sales for Co-Diagnostics, who related the following :

a)  Since their previous conversation on April 8, 2020, Co-Diagnostics had been involved in two business transactions connected to Buffalo, New York.

b)  The first transaction was with "Individual 4", a dentist in the Buffalo, New York area. "Individual 4" purchased 1,000 tests from Co-Diagnostics. The dentist stated he was purchasing the tests as part of an effort to open a COVID-19 testing laboratory. "Individual 4" was not able to get the required license and/or permit from the State of New York or operate the laboratory. Co-Diagnostics was attempting to facilitate the sale of the tests from the dentist to a second company.

c)  The second company was called Clean Earth Products. Co-Diagnostics had entered into a distribution agreement with Clean Earth Products. The company is in Naples, Florida. The Clean Earth Product's representative is "Individual 3".

d) On or about April 17, 2020 Co-Diagnostics shipped 5,000 COVID-19 tests to Clean Earth Products C/O Med-Cor, 155 Summer Street, Buffalo, New York. The total cost of the test was $40,000.

e) Since April 8, 2020 Co-Diagnostics has learned their distributors are not required to register with FDA.

f) Co-Diagnostics charged Clean Earth Products $8.00 per test. Clean Earth Products can resell the tests. An HSI agent asked a representative if $35.00 was a reasonable resale price. They stated tests are selling for up to $40.00 per test.

g) The Co-Diagnostics COVID-19 test can only be performed in a CLIA certified laboratory.

42.     On or about April 20, 2020, HSI agent searched for records related to Clean Earth Products on the State of Florida, Division of Corporations website. Clean Earth Products, LLC, was organized on March 24, 2020. The corporation address is 20 Creek Circle, Naples, Florida. "Individual 3" was listed as both the Registered Agent and the Manager of the corporation.   From BELLA's public Facebook account, it appeared that he was in Florida around the time frame that Clean Earth Products, LLC, was organized in March 2020.

43.     On or about April 21, 2020, HSI agents reviewed the website for the New York Department of Health's Clinical Laboratory Evaluation Program located at https://www.wadsworth.org/regulatory/clep.   According to that website, "all clinical and forensic laboratories and blood banks located in or accepting specimens from New York State must hold a New York State Department of Health clinical laboratory permit."   The website also offers a query tool that allows users to search for approved clinical laboratories.   HSI

searched for all approved laboratories in Erie County, New York, and reviewed the returned list. Med-Cor is not on the list of approved laboratories.

44. On or about April 22, 2020, HSI agents spoke again with the Head of International Sales for Co-Diagnostics, and they were advised that "Individual 3", Clean Earth Product's representative, submitted a purchase order to Co-Diagnostics for 5,000 COVID-19 tests to be delivered to Med-Cor, located 155 Summer Street, Buffalo, New York. The purchase order stated Med-Cor and BELLA were the end user of the test kits, which Co-Diagnostics took to mean that Med-Cor is a laboratory capable of running COVID-19 tests. Co-Diagnostics shipped the tests to Med-Cor on April 17, 2020. According to a representative from Co-Diagnostics, if the representation that Med-Cor was an end user capable of running the tests had not been made, Co-Diagnostics would not have sold to the tests to BELLA/Med-Cor. Additionally, if Co-Diagnostics was aware that the tests were intended for resale by BELLA/Med-Cor, Co-Diagnostics would not have fulfilled the order for the tests.

45. In sum, BELLA made numerous misrepresentations and false statements to fraudulently induce the buyer (UC) to do business with BELLA and Med-Cor. The continuing investigation through April 2020, revealed that BELLA made a number of false statements to the UC, such as:

- BELLA implied that he was part of the company that manufactured COVID-19 tests when he stated, "[W]e only have a million tests […]. I have only got 50,000 with my name on them. There are eleven (11) partners in this company…of that company. I've only got 50,000 [test kits]."

22

- Med-Cor "just sold 25,000 to the United States government, to "Individual 2", and now I've got 25,000 left." Subpoena responses indicate that "Individual 2", to date, has not purchased any COVID-19 test kits, and none from BELLA/Med-Cor.

- The Med-Cor COVID-19 Product Line" .pdf indicated tests returned results in 90 minutes, however BELLA advised the UC results were available in 45 minutes.

- BELLA stated that Med-Cor has "every single thing that can be imagined as far as testing for COVID from—from conception to shrink wrap," and that Med-Cor has "scientists and the doctors are in the lab fielding calls all day. […] It's doctors and scientists in the lab answering phones. There's not a call center."

- BELLA also stated "Let them know that we are an exclusive licensed reseller of this product. We are a distributor. There is no possible way to do this better, faster, or cheaper, then what we have to offer, we are here to help."

- BELLA has also made misleading statements designed to imply this is a point of care test when, in fact, it is a laboratory test kit. In other words, a typical doctor's office will not be able to process these test kits.

## EXECUTION OF SEARCH AND SEIZURE WARRANTS

46.   On April 23, 2020 HSI agents executed search and seizure warrants at BELLA's residence and the offices of Med-Cor.   BELLA was present in his residence when the warrants were executed.   Agents recovered various controlled substances, a digital scale, drug packaging and a firearm from BELLA's residence.   HSI agents seized COVID-19 test kits and business records from the Med-Cor office.

47.     Bella was charged by federal criminal complaint with firearms and controlled substance offenses on April 23, 2020 and was subsequently indicted on July 23, 2020.   See <u>Case</u>: Case 1:20-cr-00104-RJA-MJR.

## REVIEW OF SUBMISSIONS TO SBA

48.     On April 8, 2020, an online application was submitted for an EIDL to the SBA for MedCor Staffing Inc. This application indicates Joseph Bella is a Chief Executive Officer and 25% owner and that Diane Bella is 75% owner of MedCor Staffing Inc.   This application was electronically signed on April 8, 2020, and its is certified under the penalty of perjury that the contents are true and correct.   There is no other individual listed on the application as a representative of the company.   As part of the application, the person signing the application was required to answer a series of questions to determine eligibility for the loan.   This application contained materially false and misleading statements regarding BELLA.   The statements are detailed below:

a.  The first question on the application was that the "Applicant is not engaged in any illegal activity (as defined by Federal guidelines)."   The question was answered no, when in fact Bella was engaged in illegal activity at the time.   As indicated above, starting on March 29, 2020, Bella was engaged in wire fraud violations.

b.  Later in the application, there were questions that related to the applicant's criminal history.   One such question was "[a]re you presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?"   This question was answered "No" indicating that BELLA did not have any pending charges.   In fact, BELLA was charged with Aggravated Harassment in the 2nd Degree, an A misdemeanor, on October 26, 2019, and was arraigned in Orchard Park Town Court on November 19, 2019.   The charges were pending on April 8, 2020 when this application was submitted.     The second question regarding the applicant's criminal history was, "[h]ave you been arrested in the past six months for any criminal offense?"   This question was answered "No" when in fact, BELLA was arrested and processed by the Orchard Park Police

Department on November 19, 2019. The third question asked, "[f]or any criminal offense - other than a minor vehicle violation - have you ever been convicted, plead guilty, plead nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation (including probation before judgment)?" The question was answered "No" when in fact he did enter a nolo contendere plea in Lake County Florida to Evidence Tampering and Possession of Cocaine on April 11, 2011.

c. As part of the application, there is a section that must be filled out if anyone was assisting in the completing of this application. A person assisting in completing this application must enter his/her information including name, phone number, address and the amount of fee charged or agreed upon. This section was left blank.

d. The application contains the following warning: "In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015."

As a result of this fraudulent application, BELLA obtained EIDL advance in the amount of $10,000, which was deposited into BOA#8936 on May 4, 2020 and the remaining $81,600 was deposited into a different bank account on July 23, 2020.

## REVIEW OF SUBMISSIONS TO BANK OF AMERICA

49. On April 7, 2020, an online application for a PPP loan to the Bank of America (hereinafter "BOA") for the amount of $66,097.95 was submitted. The addendum to the application lists MedCor Staffing Inc. as the applicant and was electronically signed and certified by Joseph C. Bella. There is no other individual listed on the application as a representative of the company.

50.     As part of the application, the applicant was required to answer a series of questions on the application to determine BELLA's eligibility for the loan.   There were materially false and misleading statements submitted when answering these questions.   The statements are detailed below:

   a. A question on the form required certification that the "[a]pplicant is not engaged in any activity that is illegal under federal, state or locate law."   This question was answered as "[y]es" this is correct.   As indicated above, starting on March 29, 2020, BELLA was engaged in wire fraud violations.

   b. Another asked whether the applicant or any owner of the business was subject "to an indictment, criminal information, arraignment or other means by which formal criminal charges are brought in any jurisdiction."   This question was answered "[n]o".   In fact, Bella was charged with Aggravated Harassment in the 2nd Degree, an A misdemeanor, on October 26, 2019 and was arraigned in Orchard Park Town Court on November 19, 2019.   The charges were pending on April 8, 2020.   BELLA was arrested and processed by the Orchard Park Police Department on November 19, 2020.

   c. This application addendum was electronically signed and certified by Joseph C. Bella, including the attestation and certification that:

   "Applicant attests and certifies to Bank that it has not provided false or misleading information or statements to the Bank in this Addendum to its application for a Paycheck Protection Program loan, and that the confirmations, responses, certifications, and authorizations made to the Bank in this Addendum and its application for a Paycheck Protection Program loan are true, accurate, and correct. Applicant further attests and certifies to Bank that any false or misleading information or statements provided to the Bank in this application for a Paycheck Protection Program loan may subject the Applicant to criminal and civil liability under applicable state and federal laws and regulations, including but not limited to, the False Claims Act, 31 USC Section 3729, et. seq."

51.     The Bank of America Promissory Note for the loan amount of $66,097 was electronically signed by Joseph C. Bella, III as the authorized representative. There is no other individual listed on the Promissory Note as a representative of the company.

52.     The Promissory Note specifically sets forth the terms and conditions of the PPP

Loan and the following representations were made:

a. "Borrower is not engaged in any activity that is illegal under federal, state or local law." As indicated above in the Investigation Section of this Complaint, starting on March 29, 2020, Bella was engaged in violations of wire fraud.

b. "Neither Borrower (if an individual), nor any individual owning 20% or more of the equity of Borrower (each, an "Owner"), is subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, on probation or parole. As indicated above, this is false.

c. "Borrower acknowledges that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

d. By checking this box, you acknowledge that: (a) the funding of the Loan is conditioned upon approval of the Borrower's Application for the Loan and the Bank's receiving confirmation from the SBA that the Bank may proceed with the Loan and (b) your electronic signature as authorized representative for the Borrower will be applied to this Note and will have the same legal effect as a handwritten signature.

As a result of this fraudulent application and promissory note, Bella obtained a PPP loan in

the amount $66,097 which was deposited into BOA Account #8936 on May 6, 2020.

## EXECUTION OF SEIZURE WARRANT

53.     On or about April 24, 2020, an application for a federal seizure warrant for the

property, monies and contents contained in BOA Account #8936 held by Med-Cor was

submitted to the Honorable Michael J. Roemer, United States Magistrate Judge. Judge Roemer granted the application and the warrant was executed that same day for the property, monies, and contents contained within the BOA Account #8936 held in the name of Med-Cor.

54.     On or about May 12, 2020, the funds in the BOA Account #8936 were liquidated by the bank and are now in the possession of the CBP seizure account in the Western District of New York. The contents of this account are subject to civil forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 984.

## BOA Account #8936

## FINANCIAL TRANSACTIONS

55.     In addition, to other deposits into BOA#8936, the following chart highlights some of transactions consisting of SUA proceeds deposited into BOA Account #8936:

| Date | Description | Amount |
|---|---|---|
| 4/06/2020 | Wire transfer from *[Redacted]*, LLC | $16,000 |
| 4/08/2020 | Wire transfer from *[Redacted]* BOH of 20/04/08 KN95 Invoice | $9,600 |
| 4/16/2020 | Wire Transfer from undercover HSI account | $43,750 |
| 4/23/2020 | Payment from Allied Motion Payment: Invoice 20-1456 | $12,800 |

| 5/04/2020 | ACH Payment from Small Business Administration for EIDL Advance | $10,000 |
|---|---|---|
| 5/06/2020 | CARES Act PPP deposit | $66,097 |

56.     Subsequent to executing the search and seizure warrants HSI agents interviewed witnesses related to BELLA's offer to sell N95 masks.   Agents learned BELLA took multiple deposits for masks from customers and promised delivery when in truth BELLA did not have any masks on hand to sell and had not secured a reliable source of supply for masks.

57.     During March and April 2020, BELLA used his Facebook page to advertise the sale of protective masks.  BELLA also offered to sell masks to the HSI UC via email messages during the same time period.   On April 29, 2020, HSI agents interviewed "Individual 1" regarding BELLA.  "Individual 1" stated BELLA accepted deposits from three companies for masks which BELLA never possessed and for which BELLA did not have a supplier.   Based on the training, experience and participation in this investigation by law enforcement, the deposits identified by "Individual 1" correspond to the deposits listed in the chart above as follows and constitute SUA proceeds:

- April 6, 2020 - $16,000 from LLC;

- April 8, 2020-$9,600 –BOH of 20/04/08 N95 Invoice 10-1455; and

- April 23, 2020-$12,800-Payment from Allied Motion Payment:  Invoice 20-1456.

## CAUSE OF ACTION

58.     The allegations contained in paragraphs 1 through 57 are realleged and incorporated herein by reference.

59.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), civil forfeiture is available for any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any "specified unlawful activity," defined in Title 18, United States Code, Section 1956(c)(7).

60.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7) and incorporates the definitions contained in Title 18, United States Code, Section 1961(1)(B), which includes Title 18, United States Code, Section 1343 (wire fraud) and Title 18, United States Code, Section 1014 (fraudulent loan and credit applications).

61.     Title 18, United States Code, Section 984 provides that, in any civil forfeiture action in which the subject property is cash or funds deposited into a financial institution, the government does not have "to identify the specific property involved in the offense that is the basis for the forfeiture…it is no defense that said property has been removed and replaced by identical property" and "identical property found in the same…account as the property involved" in the forfeiture offense is subject to forfeiture.

62.     Based upon the foregoing, the HSI investigation has revealed that BELLA had devised a scheme to defraud victims by selling COVID-19 test kits, which were claimed to be FDA approved and for home use and purported N95 masks. Neither BELLA nor Med-Cor were licensed to sell such kits or authorized to provide COVID-19 testing or diagnosis as

BELLA claimed on Facebook and to an HSI UC. The COVID-19 test kits and purported N95 masks, were sold by BELLA, as CEO of Med-Cor, through Facebook, via interstate wire transfer, and shipped out of Salt Lake City, Utah to various locations across the United States. The wire fraud/SUA proceeds were deposited into BOA Account #8936 held in the name of Med-Cor Staffing Inc. In addition, as highlighted above, fraudulent applications were submitted in Bella's name to obtain EIDL and PPP loans and therefore the proceeds deposited into BOA Account #8936 constitute proceeds of wire fraud and fraudulent loan applications.

## CLAIMS FILED IN THE ADMINSTRATIVE FORFEITURE PROCEEDINGS

63.     On or about June 10, 2020, BELLA and Med-Cor, through their attorney Thomas Eoannou, Esq., submitted a claim to CBP to halt the administrative forfeiture proceedings against the defendant currency in favor of judicial forfeiture proceedings. BELLA, as CEO of Med-Cor, states that Med-Cor is the owner of the defendant currency seized, and that the defendant currency seized represents customer deposits and Paycheck Protection Programs loans.

64.     On or about June 4, 2020, Allied Motion Technologies ("Allied") submitted a claim to halt administrative forfeiture proceedings against the defendant currency in favor of judicial forfeiture proceedings. Allied states that they sent $12,800 to Med-Cor for mask purchases that were not fulfilled.

65.     On or about July 13, 2020, U.S. Small Business Administration ("USSBA"), through their attorney Burton E. Warner, Esq., submitted claim to halt administrative forfeiture proceedings against the defendant currency in favor of judicial forfeiture

proceedings. USSBA states that loans in the amount of $76,097 were provided to Med-Cor in May 2020 based on fraud and false information.

## CONCLUSION AND RELIEF REQUESTED

66.     Based upon the foregoing, the government submits that the defendant currency is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 984, as any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title and hereinafter referred to as "SUA"), to wit: wire fraud in violation of Title 18, United States Code, Section 1343 and fraudulent loan applications fraud in violation of Title 18, United States Code, Section 1014.

WHEREFORE, the United States of America respectfully requests that:

(1)     that an arrest warrant in rem be issued for the arrest of the defendant currency;

(2)     that all persons having any interest therein be cited to appear herein and show cause why the forfeiture should not be decreed;

(3)     that a judgment be entered declaring the defendant currency be condemned and forfeited to the United States of America for disposition in accordance with the law;

(4)     that the costs of this suit be paid to and recovered by the United States of America; and

(5)     that the Court grant such order and further relief as deemed just and proper.

DATED:     December 31, 2020 at Rochester, New York.


                              JAMES P. KENNEDY, JR.
                              United States Attorney
                              Western District of New York

                              s/Grace M. Carducci
                    By:      GRACE M. CARDUCCI
                              Assistant U.S. Attorney
                              United States Attorney's Office
                              Western District of New York
                              500 Federal Building
                              100 State Street
                              Rochester, New York 14614
                              (585) 399-3954
                              Grace.Carducci@usdoj.gov

STATE OF NEW YORK      )
COUNTY OF ERIE       )  ss

CURTIS E. RYAN, being duly sworn, deposes and says:

I am a Special Agent with the Homeland Security Investigations and I am familiar with the facts and circumstances surrounding the forfeiture action against $114,053.63 in United States currency seized from a Bank of America account #8936 held in the name of Med-Cor Staffing Inc.   The facts alleged in the Complaint for Forfeiture are true to the best of my knowledge and belief and were obtained during the course of the investigation of the defendant currency, and provided to the and provided to the United States Attorney's Office.

s/Curtis E. Ryan
CURTIS E. RYAN
Special Agent
HOMELAND SECURITY INVESTIGATIONS

Subscribed and sworn to before
me this 31st day of December,
2020.

s/Gabriela Rodriguez
Notary Public

GABRIELA RODRIGUEZ
Notary Public, State of New York
Qualified in Niagara County
My Commission Expires: 09/04/2022